Filed 3/28/14  P. v. Sanchez CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | B244261 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA381484) |
| v. | |
| JORGE T. SANCHEZ, | |
| Defendant and Appellant. | |

THE COURT:[*]

Defendant Jorge T. Sanchez appeals from his conviction by jury of habitual child molestation (Pen. Code, § 288.5, subd. (a))[1] (count 1) and child molestation (§ 288, subd. (a)) (count 2).  The jury acquitted him of sexual battery (§ 243.4, subd. (e)(1)) (count 3).  In counts 1 and 2, the jury found true the allegation that the offenses were committed against multiple victims (§ 667.61, subd. (b)(3)).

The trial court sentenced defendant to 31 years to life.  In count 1, the court imposed the upper term of 16 years, and in count 2, the term of 15 years to life, to be run

---

[*]     BOREN, P. J ., ASHMANN-GERST, J., FERNS, J.†

†     Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

[1]     All further references to statutes are to the Penal Code unless stated otherwise.

consecutively. Defendant was granted 597 days of custody credits and 90 days of conduct credits.

We appointed counsel to represent him on appeal. After examination of the record, counsel filed an "Opening Brief" in which she stated that she had failed to find any arguable issues. On July 17, 2013, we informed defendant that he had 30 days in which to file a supplemental brief containing any issues he wished this court to consider. No brief was received, and the cause was submitted on October 1, 2013. On October 6, 2013, defendant sent this court a letter in Spanish, which was subsequently translated. Defendant stated that the letter regarding his supplemental brief was translated for him incorrectly, and he was unaware that he had to send a brief. On November 19, 2013, this court granted him an extension of time to file his brief until December 28, 2013. On December 5, 2013, defendant filed a letter brief, written in Spanish, that includes the following claims: (1) he disagrees with his appellate lawyer's opinion that she could find no issues in his case, and he has been informed that this attorney has written a book in which she expressed a negative opinion about men, describing them as being the trash of the world; thus, she could not represent him properly while having this attitude; (2) his trial counsel was ineffective in that he did not inform defendant of many of the offenses of which he was accused, which defendant did not realize until midtrial, and he did not interrogate the witnesses as he should have; and (3) he was not brought to trial for a year and a half so that the prosecution could build the case against him.

## FACTS

**Prosecution Evidence**

The record shows that defendant was found guilty of molesting two of his nieces, E. and L. His niece E., the victim in count 1, was 21 years old at the time of trial. Defendant is married to E.'s mother's sister. From the age of seven, E. and her family lived in Los Angeles in the rear house of a lot on 65th Street. Defendant and his family lived in the front house. E. remembered sitting in defendant's living room watching TV with her older brother and her cousins when defendant called her into the back hallway.

2

He touched her breast over her clothes, and kissed her neck and mouth. He inserted his tongue in her mouth. He then sent her back to the living room as if nothing had happened. E. remembered defendant touching her breasts once a week while she lived in the rear house. He also touched her vagina over and under her clothing and penetrated her vagina with his hand.

E. could not remember specific details about many of the later incidents because she had "blacked out most of it." She did remember starting to come out of the bathroom on one occasion and finding defendant waiting outside the door. He came inside with her, bent her over, and pulled down his pants. He then penetrated her buttocks or butt cheeks—she was not sure. Afterwards he told her to check her underwear to see if she was bleeding. She did not recall feeling any pain when this occurred. E. acknowledged that she appeared happy in several photographs taken during the period of abuse.

When E.'s family moved to 94th Street and Manchester Avenue, defendant visited her family every weekend. He abused her about once a month during this time. He made E. masturbate and orally copulate him in addition to the other sexual acts. The oral copulation occurred approximately five times.

E.'s family moved to Utah, and E. came to Los Angeles on a visit with her family in August 2010. E. did not want her family to stay at defendant's house, but her mother decided to stay there. E. awoke at 9:00 or 10:00 a.m. and found defendant lying next to her in bed, touching her breast. She was 19 years old at that time.

E. did not tell anyone about the abuse because she was ashamed and afraid of what would happen with her family. E. did not want the family to fight. E. came forward when she found out that her little cousin L. said she had been abused by defendant. Upon learning about L. from her cousin M., E. told M. about the abuse she had undergone. M. then said she had also been abused by defendant. E. first spoke with police in February 2011. She had another interview with police some time later and gave more details.

At the time of trial, L. was eight years old. She testified that defendant is married to her aunt. L. and her brother stayed at defendant's house while her mother, Maria G.,

3

was working. One day, while she was watching television with her brother in defendant's living room, defendant called to her to come to the kitchen. L. thought he wanted her and her brother to come, but defendant motioned "no." When L. went to the kitchen, defendant picked her up. As he did so he touched her bottom in a way that did not feel comfortable. Defendant put her down and told her to follow him to the bathroom. Once inside, he told her to "touch his thing." He then told her to wait, and he pulled down his shorts and told her to do it again. Defendant then pulled up his shorts and left. He told L. not to tell her mother. L. did not remember going into the bathroom while defendant was brushing his teeth and grabbing his penis.

Before the incident, there had been some problems between L.'s mother, defendant, and L. L. eventually told her mother what had happened. L. next told a detective at the police station but did not remember what she told him. There were family problems after L. told about the touching.

Maria G., L.'s mother, testified that defendant and his wife babysat L. and her brother Miguel between May 31 and September 1, 2010, while Maria was working. On February 6, 2011, L. told Maria G. that defendant had done something to her that she thought was wrong. Maria G. called M., her niece, because M. had said previously that defendant had touched her when she was 14. Maria G. left her children at defendant's house because her sister Martha would be there. Martha had told Maria G. that she would take care of her children, and Maria G. knew that Martha really loved her kids.

Maria G. testified that defendant had sexually harassed her for 15 years.[2] She said he raped her when she was 15. The abuse began when Maria G. lived with Martha and defendant when she first came to the United States. Maria G. did not tell anyone because they would not believe her and would think she was the one to blame. The abuse stopped in 2010.

Maria G. believed defendant and Martha were spreading rumors about her having an affair. Maria G. was not jealous of Martha for being married to defendant because he

---

[2]     Defendant was not charged for any acts against Maria Guadalupe or M.

4

was such a good provider. She had no desire to "get back at" defendant. She reported defendant to the police because she wanted justice to be done. Maria G. is not a citizen and had not applied for immigration papers. She denied telling defendant's niece, Alejandra Sanchez, that she wanted to fix her immigration papers and that people get them "especially when incidents to kids happen."

M. was 24 at the time of trial. She testified that she was born in Los Angeles and lived here until the age of 10. She lived with her mother and her mother's boyfriend. Defendant and his wife, M.'s Aunt Martha, lived in an apartment in El Segundo. Martha babysat M. at night while M.'s mother was at work. It was a one-bedroom apartment in which there were two beds. Defendant and Martha shared one bed, and their two sons shared the other. M. would sleep in the same bed as defendant's sons. One morning when she was seven, M. woke to find defendant in bed with her under the covers. He began kissing her neck and touching her vagina under her clothing. Defendant did this nine or 10 times when M. was between the ages of seven and eight. It always occurred in the morning. Defendant once had her lie on her stomach. He took down her underpants, spit on his fingers, and touched her vagina. He told her it was okay and it was normal.

M. told her mother about the molestations when she was about eight years old. Her mother asked defendant and Martha if it was true, and they had a big argument. M.'s mother stopped speaking to her sister Martha for a couple of years. At some point, they began communicating again. The police were never called. L.'s mother called M. in 2011 about defendant. M. then told E. about her experiences, and E. confided in M. as well. M. testified that when she spoke with police the first time, she told them about the incident when defendant licked his fingers. She spoke with police for a total of two hours.

**Defense Evidence**

Alejandra Sanchez was 24 years old at trial. Defendant is her fraternal uncle. She and her child stayed with his family from July 2010 until his arrest. She testified that defendant is calm and respectful and never did anything inappropriate with her. She never saw him do anything inappropriate with anyone else or exhibit an interest in small

5

girls. Sanchez trusted defendant with her child. Sanchez had her child tested after the allegations were made in this case. The results were negative. Sanchez never saw L. near defendant while she was being cared for at his house. Sanchez told an investigator that Maria G. said she wanted to fix her immigration papers.

Defendant's aunt, Ana Rosa Lupian, testified that defendant is a happy and respectful family man. She never saw him exhibit an abnormal interest in young girls or behave inappropriately toward family members.

Martha, defendant's wife, has known him for 25 years. She had four sisters, including Maria G., who is L.'s mother and Maria L., who is E.'s mother. Defendant is a respectful, kind, and good person. He is not violent and does not drink a lot. Maria G. never told Martha that defendant abused her. Martha became upset once when she saw Maria G. caress defendant's face and ask him who his favorite sister-in-law was. Defendant is a musician who would work late but always get up early. He often traveled out of town.

Martha said she never babysat E. E. was only in Martha's and defendant's house when her parents were visiting. Defendant showed no interest in E., M., or L. Martha babysat L. for three weeks, but she never babysat M. When L. was there, there were eight people in the house. If L. went to the bathroom, she would tell Martha. As for M., Martha would never have allowed a young girl to share a bed with her sons because it was not right.

Martha and her husband did not spread rumors about Maria G.—Maria G. told them things. She told Martha and defendant that their landlord invited her out to eat and for coffee. One time, when Martha asked L. where her mother was, L. said she was with Martha's landlord. On another occasion, L. said that the husband of one of Martha's nieces, Lorenzo, had massaged Maria G., and this was her mother's and L.'s secret. Martha did not know if this caused problems for Maria G. with her husband, Fidel.

Martha and defendant were asked to be E.'s godparents for her Quinceañera in Utah, and to buy her a bracelet. E. was happy at her party, and she was not hesitant

6

toward defendant. The families saw one another once a year while E.'s family lived in Utah.

M.'s mother never spoke to Martha about defendant's alleged abuse of M. The police never contacted Martha about any allegations of abuse. The current charges were the first allegations Martha knew of.

Rosa Gonzalez Pizana had known defendant for 21 years. Martha is her cousin, and Pizana lived with defendant's family in Gardena when Pizana had a six-year-old daughter. Pizana never saw any inappropriate contact between her daughter and defendant. Defendant never played with her daughter alone. He was respectful towards Pizana and her daughter.

George Sanchez is defendant's son. When George was seven, neither E. nor M. slept over at the family's house. Martha took care of the cousins in the house rather than defendant. George never shared a bed with M. George first learned of E.'s allegations against defendant in a conversation with her over Facebook. George was shocked and asked her about the incidents. She told him the last incident occurred the last time she was in defendant's home in August 2010. When E. said everything happened in the morning after George had gone to work, George knew something was wrong. George never worked in the morning. It was a Friday, and George remembered that E.'s parents dropped her off at seven in the morning because they were going to Disneyland. He later stated he was asleep and did not know what time she arrived. When George woke up, E. seemed normal and was in the living room. E., George, and some of George's friends went for hamburgers at approximately 12:30 p.m. George had never known defendant to be abnormally interested in children.

Jessica Moreno is defendant's niece. Her mother is defendant's sister. Moreno lived with defendant's family when she was five years old until she was seven—from 1990 until 1991. At the time of trial, Moreno was 27. Defendant was caring and respectful and never tried to touch her or her sisters or to be alone with her or her sisters.

Matthew Martinez is a police officer for the City of Los Angeles, assigned to the 77th Sexual Assault Unit. He prepared three reports in this case, one involving M. Her

7

statement was only five lines, and took only 10 minutes. M. said she was cared for at defendant's home between 1992 and 1995, and defendant had her touch his exposed penis. She did not give a date or time or describe the circumstances. She did say that defendant would rub his hands against her vagina.

Officer Martinez interviewed defendant at the police station. Defendant initially denied any interaction with L. in the bathroom. The officers used a ruse in which they told defendant his DNA had been found on L. Defendant then admitted that he and L. had an interaction. He said that his penis started to become erect.

Defendant testified on his own behalf. He said he never abused or sexually touched M., E. or L. He never had a sexual relationship or fondled or raped Maria G. On the day of the alleged incident, he did not tell L. to meet him in the bathroom. L. touched his penis while he stood at the sink brushing his teeth. She grabbed it and squeezed it three times. Defendant turned and saw her and asked her what she was doing there. He told her to get out. This incident did not stimulate him sexually and he was not seeking stimulation. He denied that his penis became erect, and he denied telling the police that it did. He thought it would be prudent not to tell anyone about the incident so that there would not be a problem with the family. He was arrested because of this incident and let out on bail. He was then called at home and asked to meet with police. He cooperated fully.

Defendant had no problems with L., but he did tell her that she should not be spreading rumors because she was going to cause problems with her parents. L. told him three "rumors" about four months before his arrest, all of which involved L.'s mother and other men. Once, Maria G. asked defendant to scold L. for telling lies. On one occasion when defendant spoke with L. on the subject, she began to cry.

**Rebuttal Evidence**

Maria D. is M.'s mother. Martha is her sister. At the time of trial, Maria D. lived in Utah. She lived in Los Angeles from 1988 until 1997 or 1998. She and M. lived in an El Segundo apartment with defendant's family. She and M. occupied the second bedroom. Maria D. used to leave M. with Martha when she went to work early in the

8

morning. M. would be in bed with defendant's sons. M. never said anything that led Maria D. not to want Martha as a babysitter.

At one point, M. said defendant touched her, although she did not provide details. Maria D. and M. moved to another apartment in El Segundo. Defendant and his family soon moved there, too. Maria D. was angry, and stopped speaking to defendant's family for some time. She did not call the police because she did not think that Martha would believe her rather than defendant. Maria D.'s relationship with M. is not very good because she had failed to defend her daughter when she should have defended her. Defendant's family used to visit Maria D. and M. in Utah, but it was not because they were invited. Maria D. eventually resumed her relationship with Martha and defendant, but M. would not speak to defendant. Maria D. admitted using a false name and false documents for employment and immigration purposes.

## DISCUSSION

With respect to defendant's complaint about his appellate attorney, Vanessa Place, defendant followed up his letter brief by sending this court a printout of an excerpt drawn from an article entitled "Poetics of Guilt" by Anna Moschovakis.[3] This article is a review of Place's 2010 book entitled "The Guilt Project: Rape, Morality, and Law," an analysis of the prosecution of sex offenders. Defendant underlined a portion of the review describing his attorney's effort to distinguish between an ethical and moral approach to guilt, and he apparently believes this somehow bolsters his claim of an anti-male bias. According to the review, Place presents a "nuanced argument about criminal law" and discusses what she considers "the counter-intuitive laws concerning rape." Clearly, defendant, who apparently does not read or write English, has no knowledge of the contents of this book and has been completely misinformed as to its contents. Place is consistently an advocate for convicted sex offenders. Defendant's careless argument is, to say the least, without merit.

---

[3] According to the printout, the article appeared in American Book Review, Volume 32, Number 4, (May/June 2011) pages 9-10.

Defendant also makes claims indicating he believed his counsel was ineffective. "To establish ineffective assistance, defendant must show both that his counsel's performance was deficient and that he suffered prejudice." (*People v. Linton* (2013) 56 Cal.4th 1146, 1166.) With respect to trial counsel, the record shows that, contrary to defendant's assertions, trial counsel effectively cross-examined the witnesses against defendant. We disagree with defendant's characterization of the detective's testimony as favorable to defendant. The fact that counsel did not use the three pages of questions drafted by defendant is not an indication that counsel was ineffective. "A defendant does not have a right to present a defense of his own choosing, but merely the right to an adequate and competent defense." (*People v. Welch* (1999) 20 Cal.4th 701, 728.) Matters such as "'whether objections should be made and the manner of cross-examination are within counsel's discretion and rarely implicate ineffective assistance of counsel.'" (*People v. Mai* (2013) 57 Cal.4th 986, 1018.) Unless the record reveals the complete absence of tactics, a claim of ineffective assistance must fail. (*People v. Jones* (2003) 30 Cal.4th 1084, 1115.) The record shows that defense counsel effectively lobbied for admission of the evidence of L.'s rumor-spreading so as to allow the defense to attempt to impeach her credibility by providing a motive for lying about defendant. The evidence was admitted despite the trial court's reluctance. In this and other ways, counsel mounted a vigorous defense. Although defendant claims he did not know what he was accused of until midtrial, defendant was provided with a Spanish interpreter at all times, including the preliminary hearing and evidentiary hearings, and he must therefore have known the charges brought against him and the evidence the prosecutor sought to present.

With respect to defendant's claims that the witnesses lied, we must point out that the jury listened to all of the witnesses, including those who impeached the accusing witnesses' testimony. The trier of fact heard defendant's version of events, and the jury believed the two victims. It is the exclusive function of the trier of fact to assess the credibility of witnesses and draw reasonable inferences from the evidence. (*People v. Letner & Tobin* (2010) 50 Cal.4th 99, 162.) The fact that Maria D. was brought from

10

Utah to testify for the prosecution was before the jury also, since she was cross-examined about being contacted the previous day and flown to Los Angeles to testify. The jury was instructed regarding the factors to consider in assessing a witness's credibility, such as whether the witness's testimony was influenced by bias or a personal relationship, whether the witness admitted to being untruthful, and whether the witness engaged in other conduct that reflects on his or her credibility. (CALCRIM No. 226.)

As for the delay in bringing defendant to trial, the record shows that there were numerous continuances, almost all of them requested by the defense. Defendant always waived the statutory time limit.

We have examined the entire record, and we are satisfied that defendant's attorney has fully complied with her responsibilities and that no arguable issues exist. (*People v. Wende* (1979) 25 Cal.3d 436, 441.)

The judgment is affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.